UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

WANDER ESPINAL,

                        Petitioner,                    ´13 Civ. 8692

       -against-                                        OPINION

SUPT. WILLIAM LEE,

                        Respondent.

----------------------------------------X

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY  FILED        │
│ DOC #:                       │
│ DATE FILED:    11 3 14       │
└─────────────────────────────┘
```

A P P E A R A N C E S:

              Pro Se

              WANDER ESPINAL
              Green Haven Correctional Facility
              P.O. Box 4000
              Stormville, NY 12582


              Attorney for Respondent

              ERIC T. SCHNEIDERMAN
              Attorney General of the State of New York
              120 Broadway
              New York, NY 10271
              By:  Paul B. Lyons, Esq.

**Sweet, D.J.**

Petitioner, Wander Espinal ("Espinal" or the "Petitioner"), filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he alleges that he is in state custody in violation of his federal constitutional rights.  Based upon the conclusions set forth below, the petition is denied.

**Prior Proceedings**

From August 2007 to February 2008, Petitioner, Rafael Alvarez ("Alvarez"), Danny Joel Rodriguez ("Rodriguez"), and Carlos Hilario ("Hilario") were all members of a large-scale cocaine-trafficking organization that operated out of Manhattan and the Bronx.  Alvarez, the leader, ran the drug business, with Petitioner serving as his right-hand man.  Rodriguez was in charge of procuring the cocaine.  Hilario oversaw the receipt and distribution of the drugs.  In addition to possessing and distributing several kilograms of cocaine during that six-month period, the organization also solicited and directed at least four homicides and one attempted homicide in furtherance of the drug business.

1

Between January 24, 2008, and February 8, 2008, Petitioner provided Alvarez with information on the planning and progress of a plot to murder Alexander Vargas Garcia ("Pepa"). At the same time that he was conspiring to murder Pepa, Petitioner also assisted in planning and attempting to locate an individual known as "Pierero" in order to kill him.  On February 8, 2008, Pepa was gunned down near his home in Santiago, Dominican Republic.  Two days later, on February 10, 2008, a third plot was hatched to murder Francisco Apolinar Reynoso ("Bobo").  Three days after that, one of the organization's gunmen shot "John Doe," mistaking him for Pierero.  On February 19, 2008, Petitioner aided the hired shooter in locating Bobo, and Petitioner reported the murder-for-hire plan's progress to Alvarez.  Later that day, two men entered Bobo's home and killed him.  Shortly after hearing about Bobo's murder, Pierero managed to flee before the organization could find him and carry out the execution plot against him.

By New York County Indictment Number 1843/09, filed on April 22, 2009, a grand jury charged Petitioner and Alvarez with Murder in the First Degree (Penal Law § 125.27(1)(a)(vi)), Murder in the Second Degree (Penal Law § 125.25(1)), two counts of Criminal Possession of a Controlled Substance in the First

2

Degree (Penal Law § 220.21(1)), and four counts of Conspiracy in
the Second Degree (Penal Law § 105.15) (one count of conspiracy
to commit the first-degree drug sale/possession and three counts
of conspiracy to commit second-degree murder). (Lyons Aff. Ex.
A.)[1]

Petitioner filed a counseled motion to reduce the
first-degree murder count to second-degree murder, arguing that
a conviction under the "contract killing" statute, Penal Law
§ 125.27(1)(a)(vi), could not be based on accomplice liability.
(Lyons Aff. Ex. B.)  The People opposed the motion.  (Lyons Aff.

---

[1]      Under the same indictment, Alvarez was also charged with three
additional counts each of first-degree murder and second-degree murder, one
additional count of second-degree conspiracy, three counts each of attempted
first-degree murder and attempted second-degree murder, two counts of first-
degree assault, and one count of first-degree criminal sale of a controlled
substance. He was convicted, upon his guilty plea, of, inter alia, Murder in
the First Degree (Penal Law § 125.27(1)(a)(i) (murder of a police officer)).
On September 19, 2011, he was sentenced to life imprisonment without parole
on the murder charge, all other terms to run concurrently. He did not appeal
his conviction.

     Rodriguez was charged with four counts of second-degree conspiracy and
one count each of first-degree criminal sale of a controlled substance and
first-degree criminal possession of a controlled substance. He was convicted,
upon his guilty plea, of Criminal Sale of a Controlled Substance in the First
Degree and Conspiracy in the Second Degree. On February 12, 2011, he was
sentenced to a determinate 8-year term on the drug count and an indeterminate
concurrent term of 4 to 12 years on the conspiracy count. He did not appeal
his conviction.

     Hilario was charged with two counts each of second-degree conspiracy
and first-degree criminal possession of a controlled substance. He was
convicted, upon his guilty plea, of Criminal Possession of a Controlled
Substance in the First Degree and Conspiracy in the Second Degree. On October
15, 2010, he was sentenced to a determinate 7-year prison term on the drug
count and an indeterminate concurrent prison term of 2 to 7 years on the
conspiracy count. He did not appeal his conviction.

Ex. C.)   The court denied the motion, holding that, "[a]s a plain reading of the statute reveals, and as the People detail more fully in their opposing affirmation, the only subsection of 125.27 which limits liability to an actor rather than an accomplice is (a)(vii), relating to felony murder.  The ordinary accomplice liability rules apply to the other subdivisions, including (a)(vi)."  (Lyons Aff. Ex. D (citing People v. Glanda, 5 A.D.3d 945 (3d Dep't 2004); People v. Reed, 265 A.D.2d 56, 62 (2d Dep't 2000)).)  On October 13, 2010, the court conducted a Wade hearing regarding the admissibility of certain identification testimony.  (Lyons Aff. Ex. E.)

On October 27, 2010, as jury selection was about to begin, Petitioner appeared with counsel before New York County Supreme Court Justice Richard D. Carruthers to discuss a plea offer.  The proceeding began with an unrecorded bench conference between the judge, the prosecutor, and defense counsel.  When the discussion resumed in open court, Justice Carruthers advised defense counsel that "the only thing on the table now" was an offer to plead guilty to the top count of the indictment, Murder in the First Degree.  (Lyons Aff. Ex. F at 3-4.)  In exchange, the judge promised to sentence Petitioner to the minimum term for that crime: 20 years to life.  (Id. at 3-4.)  The prosecutor

4

noted that Petitioner was "facing the possibility of life
without parole and certainly there's a significant chance [the
People would] recommend that" sentence if Petitioner were
convicted at trial.  (Id. at 4.)  The court added that
Petitioner could also face consecutive prison sentences on the
separate conspiracy counts.  (Id.)  Defense counsel argued that
the minimum prison term "would be a realistic sentence after
trial" because Petitioner "has a benevolent way about him."
(Id. at 5.)  The judge responded, "I don't know how benevolent
one could be in aiding one in a murder for hire."  (Id. at 5.)


       Petitioner then conferred with his attorney and
authorized him to plead guilty to one count of Murder in the
First Degree (Count 24) and two counts of Conspiracy in the
Second Degree (Counts 1 and 12), in full satisfaction of the
indictment.  (Id. at 6-7.)  After being sworn in, Petitioner
confirmed that he had discussed with counsel both the case and
his decision to plead guilty, and that he was satisfied with the
work that counsel had done on his behalf.  (Id. at 7.)
Petitioner also acknowledged that he had been informed of the
immigration consequences of pleading guilty and wanted to do so
regardless of those consequences.  (Id. at 8.)

The court recited the facts of the conspiracies.
Petitioner admitted that he and his co-defendants, Alvarez,
Hilario, and Rodriquez, were "in the drug business," possessing
and distributing kilograms of cocaine in New York and Bronx
counties from about August 2007 to February 2008.  Petitioner
affirmed that, between January 28 and 29 of 2008, he had engaged
in several phone conversations with Alvarez and Hilario.  (Id.
at 8-9.)  Specifically, Petitioner and Alvarez directed Hilario
to meet someone in the vicinity of Pelham Parkway in the Bronx
and receive four kilograms of cocaine.  (Id. at 9.)  During one
of the phone conversations, Petitioner warned Alvarez that "the
police might be in the [vicinity] of the meet."  (Id.)
Petitioner also confirmed that he and Alvarez had, through
Hilario, possessed the four kilograms of cocaine Hilario had
received.  (Id.)  Petitioner stated that his duties in the drug
business included meeting with suppliers and customers, as well
as receiving drugs and money.  (Id. at 13.)

In addition, Petitioner acknowledged that he and
Alvarez had also engaged in an unlawful agreement to kill
Pierero.  (Id. at 9-10.)  Petitioner verified that he was
specifically tasked with locating Pierero in the Dominican
Republic so that a hired killer could murder him.  (Id. at 10.)

Petitioner spoke with several people about the contract killing, including a man named "Laca" who was eventually hired for the job. (Id. at 15-16.)  Petitioner stated that he was aware that another man who was mistaken for Pierero was shot, but Petitioner did not know who the shooter was.  (Id. at 16.)

Next, Petitioner admitted that he "assist[ed]" Alvarez in having Francisco "Bobo" Apolinar Reynoso killed.  (Id. at 16.)  In particular, Petitioner affirmed that he and Alvarez, with the intent to kill Bobo, agreed to hire one or more people in the Dominican Republic to execute Bobo.  (Id. at 10, 16.)  Petitioner further confirmed that, pursuant to the agreement, he had hired and wired money to a gunman who had, in fact, murdered Bobo.  (Id. at 10, 16.)

After these factual allocutions, Petitioner acknowledged that he understood that, by pleading guilty, he relinquished his right to trial by jury, to confront witnesses, to remain silent, and to require the State to meet its burden of proving his guilt beyond a reasonable doubt.  (Id. at 11.)  Petitioner also understood that he was giving up the right to present any possible defenses at trial.  (Id.)  After confirming that Petitioner would receive 20 years to life on the murder

7

count and 8-1/3 to 25 years on each conspiracy count, all to run
concurrently, the judge warned Petitioner, "[l]egally, if and
when I accept this plea today, you will not be able to tell me
you want the plea back and go to trial."  (Id. at 12.)
Petitioner acknowledged that he understood those terms.  (Id.)
Petitioner further affirmed that he had not been threatened or
coerced into pleading guilty.  (Id.)  Rather, Petitioner
confirmed that was doing so "of [his] own free will" and because
he was, in fact, guilty of those crimes.  (Id.)

          The prosecutor then questioned Petitioner further
about the details of the Bobo murder conspiracy.  Petitioner
affirmed that he had made phone calls to the Dominican Republic
in an effort to find Bobo for the murder.  (Id. at 17.)
Specifically, Petitioner had made "many" calls to people in the
Dominican Republic in order to locate Bobo and obtain a
description of what he was wearing.  (Id. at 17-18.)  Petitioner
subsequently relayed that information to Alvarez and others in
the Dominican Republic.  (Id. at 18.)  Petitioner stated that he
was "just following orders" and did not know what Alvarez's
problem with Bobo was "all about."  (Id. at 17.)  Petitioner
acknowledged that he knew of a man named Alex Pepa.  (Id.)  But
when asked if the "whole problem ar[o]se when Alex Pepa had a

dispute with [Alvarez's] brother," Petitioner responded, "I really don't know." (Id.)  Petitioner did admit, however, that he knew the killing of Bobo "was related to that problem." (Id.)

Eventually, Petitioner said, "I'm ready to plead guilty, I don't know why you are asking me so many questions." (Id. at 18.)  Petitioner stated that he did not know who was originally supposed to kill Bobo.  (Id.)  When asked if it was Augustine Espinal who actually killed Bobo, Petitioner responded "No. . . . I don't know who it was."  (Id.)  Petitioner also confirmed that he had seen the People's evidence of the wiretapped conversations between Alvarez and himself, and acknowledged that all of the facts he had admitted to during the plea allocution were contained in those conversations.  (Id. at 19.)  Petitioner then stated, "I don't want to answer any more questions" (id.), at which point the following conversation occurred:

> THE COURT: Well, if you don't want to answer them then I may not accept the plea. I have to be satisfied that you are, in fact, guilty of the crimes charged.
>
> [THE PROSECUTOR]: Is it true that all the things that you talked about today you did for and with [Alvarez]?
>
> THE DEFENDANT: Yes.

[THE PROSECUTOR]: And you did them all voluntarily?

THE DEFENDANT: No.

THE COURT: He didn't do them voluntarily. Is he pleading some sort of defense?  And if so, he has to waive that defense or I'm not going to accept the plea.

THE DEFENDANT: I was following orders.

[THE PROSECUTOR]: And you were working for [Alvarez]; is that correct?

THE DEFENDANT: Yes, those were the orders that I was following, that's why I followed the orders.

THE COURT: And you were being paid by [Alvarez]; is that correct, in some manner, money or drugs?

THE DEFENDANT: Money.

[THE PROSECUTOR]: And you were working for [Alvarez] voluntarily; is that correct?

THE DEFENDANT: Yes.


(Id. at 19-20.)  Petitioner went on to admit that he had

"personally wired" money from New York to people in the

Dominican Republic "to carry out these crimes."  (Id. at 20.)

After the prosecutor stated that he was "satisfied with the

Petitioner's plea allocution," an unrecorded bench conference

occurred.  (Id. at 21.)  When the discussion resumed in open

court, Justice Carruthers asked Petitioner, "I just want to be

sure that you were working for [Alvarez] . . . voluntarily and

10

you followed his orders because he was your boss, right?"  (Id.)

Petitioner responded, "[t]here was a reason, but I don't want to

mention it now. I wanted to say it at the beginning, but they

wouldn't accept it, so . . . ."  (Id.)  The judge interjected,

"[t]hen I'm not going to accept the plea.  You have to have done

this work voluntarily."  (Id.)  Petitioner then replied, "[y]es,

I did work for him voluntarily."  (Id.)  Petitioner added that

he "d[id]n't want to say anything that isn't so."  (Id. at 22.)

The court advised Petitioner that he did not have to say

anything else as long as he understood the questions he was

asked and as long as he answered them truthfully.  (Id.)

Petitioner affirmed that he did.  (Id.)  At that point, the

court accepted Petitioner's guilty plea.

On November 3, 2010, Petitioner was interviewed by the

Probation Department.  (Lyons Aff. Ex. G at 3.)  According to

the Probation Department's Pre-Sentence Report ("PSR"),

Petitioner admitted during that interview that he was guilty of

the present crimes.  (Id.)  Petitioner further stated that Bobo

"was killed in Dominican Republic" but that Petitioner "did not

tell anyone to kill him."  (Id.)  Petitioner told the probation

officer, "I don't know who killed him," and "the police were

listening to the phone and thought I did it."  (Id.)

11

On November 10, 2010, Petitioner appeared with his attorney before the Hon. Bonnie G. Wittner for sentencing. (Lyons Aff. Ex. H.)  The prosecutor relied on the promised sentence of 20 years to life in prison on the murder conviction, stressing that Petitioner was a "significant member" of the drug organization that Alvarez ran.  (Id. at 2.)  The prosecutor described Petitioner's participation in the drug conspiracy and in the conspiracy to kill Pierero.  (Id. at 2-3.)  In addition, the prosecutor related Petitioner's role in the murder of Bobo, being "equally involved with Alvarez in the planning, the organization and actually carrying out of this killing."  (Id. at 3.)  Specifically, Petitioner made numerous calls on the day of the killing "which clearly show he was talking to people who were looking for and locating Bobo, telling [the shooter] what he was wearing [and] where he was sitting."  (Id.)

Defense counsel remarked that there was an issue with the "Summary of Defendant's Statement" section of the PSR, and reminded the court that the PSR "follows [Petitioner] into the state institution."  (Id. at 1-2, 4.)  The judge noted that Petitioner told the Probation Department "I don't know who killed" Bobo, and that the "police were listening to the phone

12

and thought I did it." (Id. at 4.) Counsel relayed that
Petitioner "said he never made that statement," and therefore
asked the court to "scratch out and redact the last sentence
from the report." (Id.) The People did not object, and the
court agreed to redact the last sentence. (Id.) The court
commented that Petitioner was never charged with being the
shooter; rather he "was charged with acting in concert to commit
a murder for hire with Alvarez." (Id.)

        The prosecutor then raised Petitioner's statement in
the PSR that he "did not tell anyone to kill [Bobo]." (Id.)
Defense counsel offered that:

> It doesn't seem to be harmful in this case. I don't
> know exactly what was said [to the Probation
> Department] because [Petitioner] said that there was a
> communication problem. I would have liked this to
> have been conducted in Spanish which is how it should
> have been done. I can let it go as it is, it seems
> but it really is something that an adjournment would
> serve to have it re[]done.

(Id. at 4-5.)

        After amending the PSR to indicate that Petitioner was
not a second felony offender, the court asked Petitioner if he
would like to make a statement. (Id. at 5-6.) Petitioner said,
"I would like to apologize to Bobo, Bobo's mother and his

family.  This was not my intention.  I would like to apologize

to the family of [Pierero].  Thank god he did not die because he

is my friend.  That is all." (Id. at 6.)  Defense counsel

declined to add anything further.  (Id.)  The court then

remarked,

> This was a negotiated plea.  We were in the middle of
> jury selection and [Petitioner] requested this plea.
> And we spent quite a bit of time on the allocution,
> there is no doubt in my mind [Petitioner] pled guilty
> to avoid a stiffer sentence.  The evidence is more
> than sufficient, if we had finished the trial for the
> jury to find him guilty beyond a reasonable doubt.  He
> took the plea, he asked for the sentence and we
> negotiated the sentence that I am about to impose.

(Id.)  The court then sentenced Petitioner to an indeterminate

prison term of 20 years to life on the murder count, to run

concurrently with an indeterminate term of 8-1/3 to 25 years on

each conspiracy count.  (Id.)  Finally, the court reiterated

that it was striking both the last sentence from the summary of

Petitioner's statement in the PSR and the report's designation

of Petitioner as a second felony offender.  (Id.)  Defense

counsel did not object.

On December 3, 2010, three weeks after his sentencing,

Petitioner submitted a pro se motion to withdraw his guilty

14

plea.  (Lyons Aff. Ex. I.)  The motion (which appears to be a
pre-printed form) stated that Petitioner: "was not fully aware
of the circumstances involved when he" pled guilty; pled guilty
"for reasons which are outside of the record"; and was "truly
unaware of the consequences of his plea" or that he had "a good
meritorious defense."  (Lyons Aff. Ex. I ¶¶ 5, 7.)  Petitioner
added, in handwriting, that he was "innocent of charge," and
that he received "[i]neffective assistance of counsel and
[t]ranslation."  (Lyons Aff. Ex. I ¶ 6.)  The People submitted
an affirmation opposing the motion (Lyons Aff. Ex. J), and on
May 5, 2011, the court summarily denied the motion, citing only
the People's affirmation. (Lyons Aff. Ex. K.)


        Petitioner filed a counseled brief on direct appeal in
the Appellate Division, First Department, asserting a single
claim – that the trial court's "failure to conduct any inquiry
of [Petitioner], when the essence of [Petitioner's] statement in
his pre-sentence report represented a denial of guilt,
require[d] that [Petitioner's] guilty plea be vacated." (Lyons
Aff. Ex. L at 9; see also Lyons Aff. Ex. M (Record on Appeal).)
The People submitted an opposition brief.  (Lyons Aff. Ex. N.)

Petitioner also filed a pro se supplemental brief. (Lyons Aff. Ex. O.)  Although not entirely clear, the brief appeared to assert that Petitioner's assigned counsel, Richard Verchick, was ineffective because he advised Petitioner to accept the plea even though, according to Petitioner: (1) there was insufficient evidence to convict Petitioner (Lyons Aff. Ex. O at 7-8); (2) the case against Petitioner was weak in light of Petitioner's potential duress defense, i.e., that Petitioner was not acting voluntarily when he participated in the murder scheme, but rather only followed orders so as to keep Alvarez from retaliating against Petitioner and his family; yet counsel failed to request the court to conduct an inquiry at the plea as to whether Petitioner was aware of the defense and wished to waive it (id. at 6-7, 9-12); (3) the People lacked jurisdiction to prosecute Petitioner in New York, because the murder occurred in the Dominican Republic (id. at 8, 12); (4) most of the evidence against Petitioner consisted of phone conversations, which would have been precluded from trial as violative of Petitioner's right to confront witnesses (id. at 8); and (5) the plea agreement was a "horrible deal" for Petitioner, and counsel "was simply trying to end this case as quickly as possible" (id. at 11).  Aside from the ineffective-counsel claim, Petitioner also asserted that he was denied due process when the court

16

"closed the courtroom during the plea process." (Id. at 12-15.)
The People filed a separate brief opposing the pro se
supplemental brief. (Lyons Aff. Ex. P.)

On October 4, 2012, the Appellate Division unanimously
affirmed the judgment of conviction. People v. Espinal, 99
A.D.3d 435 (1st Dep't 2012) (Lyons Aff. Ex. Q). First, the
Appellate Division found that, "[s]ince [Petitioner] did not
move to withdraw his plea prior to sentencing, and since there
is nothing in his plea allocution that would cast doubt on his
guilt or otherwise call into question the voluntariness of his
plea, the [trial] court was under no obligation to conduct a sua
sponte inquiry into statements he made to the probation officer
preparing the presentence report." Espinal, 99 A.D.3d at 435
(citations omitted). The Appellate Division further held that,
"[i]n any event, the statements at issue in the presentence
report do not contradict [Petitioner's] plea allocution or
negate any element of the crime." Id. at 435-36.

Second, the Appellate Division found that Petitioner's
"pro se ineffective assistance of counsel claim would require a
CPL 440.10 motion to expand the record." Id. at 436. "On the
existing record, to the extent it permits review," the Appellate

17

Division found that Petitioner "received effective assistance under the state and federal standards." Id. Finally, the court stated that it had "examined [Petitioner's] remaining pro se arguments, and [found] them to be without merit." Id.

Petitioner filed a counseled application for leave to appeal to the New York Court of Appeals, asserting all issues raised in "appellant's brief to the Appellate Division." (Lyons Aff. Ex. R.) Petitioner separately applied pro se for leave to appeal to the Court of Appeals as to all issues raised in both his counseled and pro se briefs. (Lyons Aff. Ex. S.) On December 28, 2012, the Court of Appeals denied leave to appeal. People v. Espinal, 20 N.Y.3d 986 (2012) (Lyons Aff. Ex. T).

Petitioner filed no state-court collateral proceedings. (Pet. ¶ 11.) Petitioner filed the instant pro se habeas petition, asserting the following claims: (1) the guilty plea should be vacated because the trial court "fail[ed] to conduct any inquiry of Petitioner, when the essence of [Petitioner's] statement in his pre-sentence report represented a denial of guilt"; (2) "trial counsel provided ineffective and prejudicial representation during both pre-trial and plea negotiation[] proceedings"; and (3) "Petitioner's rights to a

18

public trial were violated when the trial justice closed the
courtroom during the plea process." (Pet. ¶ 13.) Petitioner's
habeas claims expressly referenced and attached his counseled
and pro se Appellate Division briefs. (Pet. ¶ 13.) The
petition was opposed by the Respondent and marked fully
submitted on July 23, 2014.


**The Ineffective Counsel Claim is Unexhausted and Unsupported**


Petitioner has asserted that his "trial counsel
provided ineffective and prejudicial representation during both
pre-trial and plea negotiation[] proceedings." (Pet. ¶ 13.)
Because the petition expressly references Petitioner's Appellate
Division briefs on direct appeal (Pet. ¶ 13), Petitioner's claim
will be construed to assert the same ineffective-counsel claim
that he asserted in his pro se supplemental brief in the
Appellate Division (Lyons Aff. Ex. O).


Petitioner did not fully exhaust his ineffective-
counsel claim. The Appellate Division found that Petitioner's
"claim would require a CPL 440.10 motion to expand the record."
Espinal, 99 A.D.3d at 436. CPL § 440.10(1) provides that "[a]t
any time after the entry of a judgment, the court in which it

19

was entered may, upon motion of the defendant, vacate such
judgment . . . ."  N.Y. CPL § 440.10(1).  Thus, Petitioner's
claim may not be deemed exhausted and is procedurally barred,
because it was not properly raised in the state court and
Petitioner may still seek relief in state court by bringing a
CPL § 440.10 motion.[2]


     A court confronted with a habeas petition containing
both exhausted and unexhausted claims, a so-called "mixed
petition," has several options.  First, the court may dismiss
the entire petition for failure to comply with AEDPA's
exhaustion requirement.  28 U.S.C. § 2254(b)(1)(A).  Second, the
court may deny even the unexhausted claims on the merits.  28
U.S.C. § 2254(b)(2).  Third, the court retains discretion to
stay the petition and permit the Petitioner to exhaust the

---

[2] Although Petitioner's argument on this point is not entirely clear, this
Court liberally construes Petitioner's reply to assert that the Government's
contention that the ineffective assistance of counsel claims are unexhausted
overlooks case law that would allow the failure to bring to a CPL § 440.10
motion as procedural default inadequate to preclude federal review.  (Pet.
Reply 7-11, 12-16).  The case law on which Petitioner relies, however, is
inapposite and inapplicable to this case.  See, e.g. Martinez v. Ryan, 132 S.
Ct. 1309 (2012) (discussing state law that requires ineffective-assistance-
of-trial counsel claims must be raised in an initial-review collateral
proceeding); Monroe v. Kuhlman, 433 F.3d 236 (2d Cir. 2006) (discussing a
judicial supervision claim and defaults based on state procedural rules);
Fama v. Commissioner of Correctional Services, 235 5.3d 804 (2d Cir. 2000)
(regarding whether a federal district court erred in concluding certain
claims were procedurally barred when not directly addressed in explicit
language by the state courts); Kindler v. Horn, 542 F.3d 70 (3d Cir. 2008)
(cited in Petitioner's reply, but vacated and remanded by the Supreme Court).

20

unexhausted claims in state court, but only where the Petitioner has shown good cause for failure to previously exhaust and the unexhausted claims are not plainly meritless. Rhines v. Weber, 544 U.S. 269, 278 (2005). Fourth, where the court determines that neither a stay nor a dismissal of the petition for failure to exhaust is appropriate, the court may permit the Petitioner to amend the petition to delete the unexhausted claims. See Johnson v. Kirkpatrick, No. 11 Civ. 1089, 2011 WL 3328643, at *12-13 (S.D.N.Y. Aug. 3, 2011). Alternatively, where the limitations period has run, the Court may deem the petition to have been amended to delete the unexhausted claims, under the assumption that the Petitioner would prefer the court to consider the exhausted claims on the merits instead of dismissing the petition for failure to exhaust and foreclosing any return to federal court. Id.

    In this case, no basis for a stay and abeyance of this action has been established because Petitioner has not alleged, much less established, any "cause" for failing to exhaust his claim prior to filing his habeas petition and, the claim is, in any event, "plainly meritless." Rhines, 544 U.S. at 277.

Alternatively, this Court should deny (but may not grant) relief on the merits of the unexhausted claim. As noted above, in Rhines, 544 U.S. at 277, the Court held that it would be an abuse of discretion to stay a mixed petition when the unexhausted claims are "plainly meritless." The proper standard for a District Court's exercise of its authority to deny an unexhausted claim on the merits under 28 U.S.C. § 2254(b)(2) is whether the unexhausted claim is "plainly meritless." Here, Petitioner's unexhausted ineffective-counsel claim is plainly meritless.

The Appellate Division found, "[o]n the existing record, to the extent it permits review," that Petitioner "received effective assistance under the state and federal standards." Espinal, 99 A.D.3d at 436. Accordingly, to the extent that Petitioner's claim is based on the state-court record, and thus properly exhausted, the Appellate Division's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

The federal standard for reviewing an ineffectiveness claim is set forth in Strickland v. Washington, 466 U.S. 668 (1984), which holds that a Petitioner must show that his counsel

22

supplied deficient representation and that the Petitioner

suffered prejudice as a result.  Id. at 687.  The Petitioner

need not establish that he will necessarily succeed on his

claims, but he must establish that the claim is plausible.

Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009)

(quoting Armienti v. United States, 234 F.3d 820, 823 (2d Cir.

2000).


Under the first Strickland prong, counsel is "strongly

presumed" to have rendered adequate assistance and to have made

all significant decisions in the exercise of reasonable

professional judgment.  Strickland, 466 U.S. at 686, 689-90.

"The question is whether an attorney's representation amounted

to incompetence under 'prevailing professional norms,' not

whether it deviated from best practices or most common custom."

Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (quoting

Strickland, 466 U.S. at 690).  "Strickland does not guarantee

perfect representation, only a reasonably competent attorney."

Id. at 791 (citation omitted).  There are "'countless ways to

provide effective assistance in any given case' and . . .

'[e]ven the best criminal defense attorneys would not defend a

particular client in the same way.'"  United States v. Aguirre,

912 F.2d 555, 560 (2d Cir. 1990) (quoting Strickland, 466 U.S.

23

at 689). Accordingly, it is well established that "[a]ctions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." Mason v. Scully, 16 F.3d 38, 42 (2d Cir. 1994) (internal quotation marks omitted). A fair assessment of the reasonability of an attorney's actions requires an evaluation of "challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct" and must resist the temptation of hindsight. Strickland, 466 U.S. at 690.

By contrast, a finding of prejudice under the second Strickland prong, requires a Petitioner to demonstrate that there is "a reasonable probability that, but for counsel's" deficient performance, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" Richter, 131 S. Ct. at 791-92 (quoting Strickland, 466 U.S. at 693, 697). "The likelihood of a different result must be substantial, not just conceivable." Id. In other words, 'reasonable probability' in this context means the attorney's errors were of such magnitude

24

that they "undermined confidence in the outcome." Pavel v. Hollins, 261 F.3d 210, 216 (2d Cir. 2001).

In the context of federal habeas review of a Strickland claim, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'" Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)). That is, "[t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 131 S. Ct. at 788. "And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles, 556 U.S. at 123 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

A defendant has the right to the effective assistance of counsel during the plea-bargaining process, which assistance is governed by the Strickland standard. See Missouri v. Frye, 132 S. Ct. 1399, 1405 (2012) (citing Hill v. Lockhart, 474 U.S. 52, 57 (1985)); accord Lafler v. Cooper, 132 S. Ct. 1376, 1384

(2012).  In reviewing counsel's performance, where the conduct
in question involved a recommendation that the Petitioner enter
a guilty plea, the court must be cognizant that its review of
counsel's judgment should not be made in hindsight.  The Supreme
Court has specifically cautioned that in the plea context,
courts must be wary of the "particular risk that an after-the-
fact assessment will run counter to the deference that must be
accorded counsel's judgment and perspective when the plea was
negotiated, offered, and entered."  Premo v. Moore, 131 S. Ct.
733, 742 (2011).

          In order to establish prejudice, the Petitioner must
show that "the outcome of the plea process would have been
different with competent advice."  Lafler, 132 S. Ct. at 1384.
That is, the Petitioner must show that "there is a reasonable
probability that, but for counsel's errors, [the Petitioner]
would not have pleaded guilty and would have insisted on going
to trial."  Id.  Again, such a showing must take into account
the reality of the situation faced by the Petitioner at the time
and the "uncertainty inherent in plea negotiations."  Premo, 131
S. Ct. at 739, 741-43.

Petitioner has not satisfied Strickland's prejudice prong, because he never offered a sworn affidavit asserting that, had his counsel advised him differently, Petitioner would not have pled guilty but would have insisted on going to trial. This deficiency is fatal to his claim. See, e.g., Puglisi, 586 F.3d at 216-17. Although Petitioner asserted such prejudice in his Appellate Division brief, that is no substitute for the requisite sworn statement from Petitioner. Id.

In addition, Petitioner complains that counsel advised him to accept the plea even though, according to Petitioner, there was "insufficient evidence" to convict Petitioner. (Lyons Aff. Ex. O at 7-8.) Yet, the only purported insufficiency Petitioner describes is his claim that a conviction under the "contract killing" statute, Penal Law § 125.27(1)(a)(vi), could not be based on accomplice liability. (Lyons Aff. Ex. O at 7-8.) Petitioner himself has noted (Lyons Aff. Ex. O at 7-8), counsel asserted this same argument in a motion challenging the indictment (Lyons Aff. Ex. B), and the trial court flatly rejected it (Lyons Aff. Ex. D). Moreover, there is no basis to believe that this argument would have been any more successful on appeal. Petitioner has offered no sworn evidence that counsel failed to properly discuss this matter with Petitioner.

27

Petitioner has contended that the case against him was weak in light of Petitioner's potential duress defense, and that counsel should have requested the court to conduct an inquiry at the plea hearing as to whether Petitioner was aware of the defense and wished to waive it.  (Lyons Aff. Ex. O at 6-7, 9-12.)  However, the Petitioner himself has noted (Lyons Aff. Ex. O at 6), counsel did alert the court to this issue, and the court did inquire into the matter at length at the plea hearing (Lyons Aff. Ex. F at 17-22).

Petitioner has also claimed that counsel should have argued that the People lacked jurisdiction to prosecute Petitioner in New York, because the murder occurred in the Dominican Republic.  (Lyons Aff. Ex. O at 8, 12.)  Section 20.20(1)(c) of the Criminal Procedure Law provides that New York jurisdiction over an offense can exist based on a conspiracy occurring in New York to commit that offense.  N.Y. CPL § 20.20(1)(c).  The conversations that took place in New York were sufficient to establish a conspiracy to commit the murder-for-hire, such that jurisdiction over Petitioner in New York was well established.  See People v. Carvajal, 6 N.Y.3d 305, 313-17 (2005) ("Plainly, jurisdiction over an offense exists based on a

28

conspiracy occurring in New York to commit that offense."); People v. Pinchuk, 33 Misc. 3d 310, 315 (Sup. Ct. Kings Co. 2011) (CPL § 20.20(1)(c) "grants jurisdiction over a substantive offense, even one committed wholly outside New York, as to a defendant who conspired here to commit the substantive offense."); CPL § 20.60(1) ("An oral or written statement made by a person in one jurisdiction to a person in another jurisdiction by means of telecommunication, mail or any other method of communication is deemed to be made in each such jurisdiction.").

Petitioner has also contended that most of the evidence against him consisted of telephone conversations, which would have been precluded from trial as violative of his right to confront witnesses. (Lyons Aff. Ex. O at 8.) The Confrontation Clause prevents the prosecution from introducing only "testimonial" statements of non-testifying witnesses, and the telephone conversations at issue here were clearly not testimonial. See, e.g., Crawford v. Washington, 541 U.S. 36, 51, 56 (2004) ("Most of the hearsay exceptions cover[ ] statements that by their nature [are] not testimonial—for example, . . . statements in furtherance of a conspiracy."); United States v. Farhane, 634 F.3d 127, 163 (2d Cir. 2011) ("In

general, statements of co-conspirators in furtherance of a
conspiracy are non-testimonial.") (quoting United States v.
Logan, 419 F.3d 172, 178 (2d Cir. 2005)).

Petitioner has contended that the plea agreement was a
"horrible deal" for Petitioner, and counsel "was simply trying
to end this case as quickly as possible." (Lyons Aff. Ex. O at
11.)  Petitioner's characterization of counsel's motives is
conclusory and baseless, and any notion that counsel improperly
pressured Petitioner to accept the plea offer is contradicted by
Petitioner's own statements at the plea hearing that he had not
been coerced by anyone to plead guilty, that he was pleading
guilty of his own free will, that he had discussed the plea with
counsel, and that he was satisfied with counsel's performance.
(Lyons Aff. Ex. F at 7-8, 11-12.)  Further, Petitioner's claim
that the plea agreement was a bad deal is contradicted by the
statement at the plea hearing that if Petitioner proceeded to
trial, he faced, on the first-degree murder charge alone, a
minimum of 20 years to life imprisonment (the sentence he
ultimately received), and a maximum of life imprisonment without
the possibility of parole, see Penal Law §§ 70.00(2)(a),
70.00(3)(a)(i), 70.00(5), and that he faced consecutive prison
sentences on the four conspiracy counts and the two A-1 drug-

possession counts.  (Lyons Aff. Ex. F at 4.)  See People v. Ballard, 38 A.D.3d 1001, 1004 (3d Dep't 2007) (affirming consecutive sentences for second-degree murder and second-degree conspiracy).  Given this sentencing exposure, and in light of the substantial evidence of Petitioner's guilt, the plea agreement benefitted Petitioner.

Petitioner has established neither that counsel erred nor that any such error prejudiced Petitioner.  The ineffective-counsel claim it therefore denied as plainly meritless under 28 U.S.C. § 2254(b)(2).

## The Lack of Inquiry Claim Does Not Rise to a Constitutional Level

Petitioner has asserted, as he did in his counseled brief on direct appeal, that his guilty plea should be vacated because the court failed to inquire, at the sentencing hearing, into Petitioner's purported statements to the Probation Department denying that he was guilty.  (Pet. ¶ 13; Lyons Aff. Ex. L.)  The Appellate Division denied this claim on the merits. Espinal, 99 A.D.3d at 435-36.

As noted, above, Petitioner swore under oath at his plea hearing that he was guilty of the relevant crimes.  Such "solemn declarations in open court [as those recited above] carry a strong presumption of verity."  Blackledge v. Allison, 431 U.S. 63, 74 (1977).  Moreover, at sentencing, his own counsel disavowed any notion that Petitioner asserted his innocence to the Probation Department.  (Lyons Aff. Ex. H at 4-5.)

In addition, there is no clearly established Supreme Court law holding that a sentencing court is required to raise, sua sponte, the voluntariness of the plea following a defendant's statements in a pre-sentencing report denying his guilt.  See, e.g., Sandher v. New York State, No. 04 Civ. 2152, 2009 WL 3111755, at *4-5 (E.D.N.Y. Sept. 29, 2009).  Thus, even if it is assumed, arguendo, that Petitioner actually made the statements at issue to the Probation Department, and that such statements called his guilt into doubt, the Appellate Division's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

A federal court may not consider the merits of a claim unless the Petitioner has first given the state the

32

"'opportunity to . . . correct' alleged violations of its

prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29

(2004) (quoting Duncan v. Henry, 513 U.S. 364, 365 (1995)).

Thus, the Petitioner "must 'fairly present' his claim in each

appropriate state court (including a state supreme court with

powers of discretionary review), thereby alerting that court to

the federal nature of the claim." Id. at 29; Duncan, 513 U.S.

at 365-66; O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).


**The Public Trial Claim Does Not Rise to a Constitutional Level**


Petitioner has asserted, as he did on direct appeal,

that he was denied due process when the court "closed the

courtroom during the plea process." (Pet. ¶ 13; Ex. O at 12-

15.)  The Appellate Division summarily denied this claim.  See

Espinal, 99 A.D.3d at 436 (stating that the court had "examined

[Petitioner's] remaining pro se arguments, and [found] them to

be without merit").  That decision was neither contrary to, nor

an unreasonable application of, clearly established Supreme

Court law.  See Richter, 131 S. Ct. at 784-85 (summary denial of

claim should be accorded AEDPA deference).

33

As explained in the People's supplemental brief on direct appeal (Lyons Aff. Ex. P at 9-10), the Petitioner's claim is factually inaccurate. He purports to quote certain colloquy from his plea hearing, but, in fact, the quoted colloquy occurred at the conclusion of the Wade hearing – two weeks before Petitioner's plea hearing. (Lyons Aff. Ex. O at 15 (quoting Ex. E at 42-43).) Indeed, the Wade hearing transcript makes clear that the courtroom was closed, not during Petitioner's plea hearing, but rather during his codefendant's plea hearing. (Lyons Aff. Ex. E at 42.) As the court explained, the courtroom was closed at that co-defendant's request. (Lyons Aff. Ex. E at 43.) Petitioner lacked standing to object.

There is no clearly established Supreme Court precedent holding that a defendant may claim a due process violation for a courtroom closure during a co-defendant's plea hearing. Cf. United States v. Acosta-Colon, 741 F.3d 179, 187 (1st Cir. 2013). Accordingly, the Appellate Division's decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

**Conclusion**

For the reasons set forth above, the petition for a writ of habeas corpus is denied.  No certificate of appealability will be issued.

It is so ordered.

Dated:     New York, New York
~~October~~ ___, 2014
November 3,

_____
Robert W. Sweet, U.S.D.J.

35